IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUEL ALLEN, | ) Case No. 09-2507 SC |
| | ) |
| Plaintiff, | ) MEMORANDUM OF DECISION, |
| v. | ) FINDINGS OF FACT AND |
| | ) CONCLUSIONS OF LAW |
| UNITED FINANCIAL MORTGAGE CORP.; | ) |
| ALLIANCE BANCORP; MORTGAGE | ) |
| ELECTRONIC REGISTRATION SYSTEMS, | ) |
| INC.; CALIFORNIA RECONVEYANCE CO.; | ) |
| GMAC MORTGAGE; JP MORGAN CHASE | ) |
| BANK; INVESTORS MORTGAGE AND | ) |
| REALTY; and DOES 1 through 25, | ) |
| inclusive, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**I.  INTRODUCTION**

This case concerns two loans obtained by Plaintiff Euel Allen ("Plaintiff" or "Allen") in 2006 that were secured by separate deeds of trust encumbering his personal residence.  ECF No. 29 ("FAC") ¶ 6.  Allen filed this suit in May 2009 following the initiation of non-judicial foreclosure proceedings against his home, located at 5701 Morse Drive, Oakland, California ("the Morse Drive Property" or "the Property").  See id.  Against Defendant JP Morgan Chase Bank ("Chase"), Allen alleged fraud in the origination and servicing of the loans, violations of the Truth in Lending Act ("TILA"), and violations of the Real Estate Settlement Procedures Act ("RESPA").  Id.  Against Defendant California Reconveyance

Company ("CRC"), Allen alleged violation of the Fair Debt Collection Practices Act ("FDCPA"). Id. The remaining named defendants, with the exception of Mortgage Electronic Registration Systems, Inc. ("MERS"),[1] were not served and have not appeared in this action. ECF No. 64 ("Pl.'s Trial Br.") at 2.

On March 22, 2010, the Court granted in part and denied in part a motion to dismiss filed by Chase and CRC. ECF No. 41 ("Mar. 22, 2010 Order"). The Court dismissed Plaintiff's RESPA claim, dismissed Plaintiff's TILA claim for damages, and dismissed Plaintiff's fraud claim to the extent it alleged fraud in the origination of the loans. Id. at 14-15. Accordingly, Plaintiff has three remaining claims: (1) rescission under TILA against Chase; (2) fraud by Chase in the servicing of Plaintiff's loans; and (3) violation of the FDCPA by CRC. Id.

The Court held a one-day bench trial on August 29, 2011. The Court, by this Memorandum of Decision, issues its findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. For the reasons set forth below, the Court concludes that the evidence does not support Plaintiff's claims and accordingly enters judgment in favor of Defendants Chase and CRC.

**II.  FINDINGS OF FACT**

1.  Allen has been employed as a delivery truck driver since approximately 2005. Allen Test.[2] He is currently on a medical leave of absence recovering from shoulder surgery. Id. He

---

[1] MERS was served and has appeared in this action. However, the FAC alleges no claims against MERS. See FAC.

[2] Allen was the only witness who testified at trial. The parties stipulated to the admissibility of all exhibits.

intends to resume work as a truck driver in approximately three months. Id.

2. In 2003, Allen inherited the Morse Drive Property upon the death of his father. Pl.'s Ex. 1 ("Trust Transfer Deed"); Allen Test. Allen has resided at the Property intermittently for the past thirty-five years. Allen Test. It is currently his primary residence. Id.

3. From the time he inherited the Property until October 2006, Allen's monthly mortgage payment was $1,088.30. Pl.'s Ex. 2; Allen Test.

4. In October 2006, Allen received a phone call offering him the opportunity to refinance his home. Allen Test. Allen accepted the offer to refinance and obtained two loans ("the loans") secured by separate deeds of trust against the Morse Drive Property. Id.

5. The first loan was in the amount of $448,000 and was secured by a deed of trust identifying United Financial Mortgage Corporation ("United Financial") as the lender. Defs.' Ex. 503 ("First DOT"). The second loan was in the amount of $56,000 and was secured by a deed of trust listing Alliance Bancorp as the lender. Defs.' Ex. 504 ("Second DOT"). Both deeds identified First American Title as the trustee, and Mortgage Electronic Registration Systems, Inc. ("MERS"), acting solely as a nominee for the lender, as the beneficiary.

6. Allen used approximately $300,000 of the loan money to pay off the existing mortgage on the Property. Allen Test. He used between $50,000 and $100,000 to pay his deceased father's

1  outstanding medical bills.  Id.  He also used a portion of the
2  money to make repairs to the Property.  Id.
3         7.  At the time he obtained the loans, Allen believed
4  that the loans carried a low, fixed interest rate.  Allen Test.
5  His initial monthly payment was approximately $1,200.  Id.
6         8.  The deed of trust for the $448,000 loan provided for
7  an "adjustable rate balloon rider."  Defs.' Ex. 503.  Allen
8  testified that he did not read the deed of trust before signing it
9  and that he did not understand what an "adjustable rate balloon
10 rider" was at the time.  Allen Test.
11        9.  After consummation of the loans, United Financial and
12 Alliance Bancorp each sold their interests in the loans to
13 Washington Mutual Bank ("WaMu").  FAC ¶ 17; ECF No. 44 ("Defs.'
14 Ans. to FAC") ¶ 17.
15        10.  On October 24, 2007, Allen received a letter from
16 WaMu informing him that the interest rate on his "adjustable
17 mortgage loan" would increase as of December 1, 2007, and that his
18 new monthly payment would be $1,217.76.  Pl.'s Ex. 7; Allen Test.
19        11.  In April 2008, Allen received a letter from WaMu
20 informing him that if he continued to pay only the minimum amount
21 due each month his monthly payment would rise to $3,409.02
22 effective October 2008.  Pl.'s Ex. 8; Allen Test.
23        12.  On May 20, 2008, Allen wrote a letter to WaMu
24 explaining that he could not afford an increase in his monthly
25 payments, expressing his desire for a loan modification, and
26 expressing outrage that the terms of his loan provided for such a
27 sharp increase.  Pl.'s Ex. 9.  He received no response.  Allen
28 Test.

13. On September 25, 2008, Chase entered into a Purchase and Assumption Agreement ("PAA") with the Federal Deposit Insurance Corporation, pursuant to which Chase acquired certain of WaMu's assets, including WaMu's interest in Allen's loans. Defs.' Ex. 508 ("PAA").

14. In October 2008, Allen received a letter from Chase informing him that Chase had acquired the servicing rights to his loans from WaMu but that future correspondence would continue to take place under the name WaMu. Pl.'s Ex. 11; Allen Test.

15. In October 2008, Allen ceased making monthly payments on his loans. Allen Test. He again contacted Chase to request a loan modification. Id.

16. Between October 2008 and October 2009, Plaintiff corresponded with Chase numerous times via telephone, fax, and mail, in an attempt to obtain a loan modification. Allen Test.; see also, e.g., Pl.'s Ex. 14 (Nov. 2008 Letter from Allen to Chase requesting modification); Pl.'s Ex. 15 (Letter from WaMu informing Allen of "homeowner assistance program"); Defs.' Ex. 510 (Chase correspondence log). He received numerous letters stating that his application was incomplete and requesting additional or updated financial information. E.g., Pl.'s Ex. 19 (letter from WaMu requesting additional proof of income); Pl.'s Ex. 30 (letter from WaMu requesting updated financials). Each time, he sent the requested information via fax and certified mail. Allen Test; Pl.'s Ex. 16 (letter from Allen to Chase providing financial documentation for loan modification application); Pl.'s Exs. 17 (certified mail receipt), 18 (fax cover sheet).

17. During this time period, Chase personnel called

1  Plaintiff and his NID-Housing Counseling Agent Renee Tucker on
2  numerous occasions to discuss the status of his modification
3  request. Defs.' Ex. 510 (Chase correspondence log). On many of
4  these occasions, Chase was unable to reach Plaintiff or his agent.
5  Id.
6          18.  On January 8, 2009, Allen received a letter from
7  Jack Mullins ("Mullins") of the WaMu Homeownership Preservation
8  Team informing him that WaMu records indicated he had inquired
9  about a loan modification. Pl.'s Ex. 23. The letter stated that
10 Mullins would review the information Allen had submitted, evaluate
11 modification options, and contact Allen within forty-five days
12 regarding the request. Id. The letter also stated

> This letter is not an approval by WaMu of a loan workout plan. During the review period, default servicing will continue, including collection and foreclosure activity. If you payoff, reinstate or agree to a repayment plan while we are reviewing your loan modification request, then you will have withdrawn your request for a loan modification, we will consider your inquiry cancelled and will take no further action to process your request.

19 Id.
20         19.  Foreclosure proceedings against the Property began
21 in January 2009. On January 22, 2009, a Notice of Default and
22 Election to Sell Under the (First) Deed of Trust was recorded with
23 the Alameda County Recorder's Office. Defs.' Ex. 507 ("NOD"). The
24 NOD indicated that the amount in arrears was $17,608.14. Id. A
25 copy of the NOD was also posted on Allen's front door. Allen Test.
26 Also on or about January 22, 2009, MERS assigned all beneficial
27 interest in the First DOT to LaSalle Bank NA as trustee for
28 Washington Mutual Mortgage Pass-Through Certificates WMALT Series

2007-OA2.  Defs.' Ex. 505.  LaSalle Bank NA then substituted CRC as trustee of the First DOT.  Defs.' Ex. 506.  CRC then issued a Notice of Trustee's Sale providing that the Property would be sold at a public sale on May 13, 2009.  Pl.'s Ex. 37.

20.  On March 2, 2009, Allen wrote a letter to Mullins. He stated in part that he did not understand why Mullins' January 8, 2009 letter informed him that foreclosure proceedings would continue while his request for a modification was reviewed but that if he made any payment in the meantime his request for modification would be cancelled.  Pl.'s Ex. 29.

21.  In March 2009 and again in May 2009, Allen received letters from WaMu asking him to provide additional financial information to complete his application for loan modification. Pl.'s Exs. 30, 35.

22.  In October 2009, Allen received a letter from WaMu/Chase informing him that he may qualify for a "Home Affordable Modification Trial Period Plan."  Allen Test.; Defs.' Ex. 513.  The plan called for Allen to make three trial monthly payments of $2,425.80.  Id. at 10.  The letter provided that Allen could enroll in the trial payment plan by returning a signed copy of the plan, documentation of hardship and income, and a check for the first trial payment.  Id. at 1.  The letter provided that if Allen returned the required documentation, Chase would review it to determine whether he qualified for the federal government's Home Affordable Modification Program ("HAMP").  If he made the three trial plan payments and Chase determined that he qualified for HAMP, then Chase would modify his loan.  Id.  The letter also provided that if Allen complied with the terms of the trial plan,

7

Chase would not pursue foreclosure during the trial plan period. Id.

23. Allen did not accept the trial period plan offer because he could not afford the trial payment amount. Allen Test. On November 12, 2009, Allen contacted Chase and advised that he could not afford the trial plan payments. Defs.' Ex. 510.

24. In response to the Court's inquiry, counsel for both parties agreed that Chase was under no legal obligation to offer Plaintiff a loan modification, and that the trial payment plan offered to Plaintiff was part of a program voluntarily initiated by Chase.

25. Allen concedes that he is not currently able to tender the balance of the loans minus interest and penalties. Allen Test.

### III. CONCLUSIONS OF LAW

#### A. TILA Claim for Rescission

TILA imposes several disclosure requirements on lenders of consumer loans and their assignees. Generally, the law requires a lender to disclose, among other things, the amount financed, the total finance charge, the finance charge expressed as an annual percentage rate, the sum of the amount financed and the finance charge ("total of payments"), and the number, amount, and due dates of payments scheduled to repay the total of payments. See 15 U.S.C. § 1638. In his FAC, Plaintiff alleges that the TILA disclosures he received were untimely and inaccurate. FAC ¶¶ 13-15. He further alleges that upon acquiring Plaintiff's loans, Chase learned of and concealed these TILA violations. Id. ¶ 30.

At trial, Plaintiff sought to rescind the loan because of the alleged TILA violations.[3]  The equitable goal of rescission under TILA is to restore the parties to the "status quo ante."  Yamamoto v. Bank of New York, 329 F.3d 1167, 1172 (9th Cir. 2003).  Accordingly, the Ninth Circuit has held that a trial court may condition rescission under TILA on the debtor's ability to tender the loan principal.  Id. at 1170-72; see also Bustamante v. First Fed. Sav. & Loan Ass'n, 619 F.2d 360, 365 (5th Cir. 1980) (creditor's TILA obligations were not automatically triggered until obligor tendered repayment).

Plaintiff presented no evidence at trial regarding whether he received or did not receive the disclosures required by TILA.  Moreover, Plaintiff conceded that he has not made and cannot make a tender offer to repay Chase the amount owed minus finance charges and penalties.  Thus, because Plaintiff has failed to prove that Chase violated TILA at all, and because he has admitted that he cannot tender the remaining loan principal, the Court finds against Plaintiff on his claim for rescission under TILA.

### B.    Claim for Fraud in the Servicing of the Loan

Plaintiff alleges that Chase engaged in fraud in the servicing of his loan.  FAC ¶¶ 52-53.  In order to prove fraud, Plaintiff must prove: (1) a false representation of a material fact; (2) knowledge of the falsity (scienter); (3) intent to induce another into relying on the representation; (4) reliance on the representation; and (5) resulting damage.  Ach v. Finkelstein, 264 Cal. App. 2d 667, 674 (1968).  The Court finds that Plaintiff has

---

[3] As noted above, Plaintiff's TILA claim for damages was dismissed as untimely in the Court's March 22, 2010 Order.

9

failed to prove that Chase made any false representations of material fact.

It is unclear precisely what fraudulent acts Plaintiff contends were committed by Chase in the servicing of the loans.[4] At trial, Plaintiff emphasized the letter he received from Mullins, which informed Plaintiff that he should not make payments while his loan modification was being reviewed even though foreclosure proceedings would continue during the review process. See FF ¶ 18. While Plaintiff understandably testified that he was confused by this statement, he presented no evidence that the statement was false or that it was made with the intent to defraud Plaintiff.

More generally, Plaintiff's counsel argued in closing that Plaintiff relied to his detriment on Chase's repeated representations that modification of his loan might be possible, when in fact Chase had no intention of modifying the loan. However, Plaintiff presented no evidence that Chase's representations regarding the possibility of a loan modification were false. To the contrary, Chase offered Plaintiff a trial payment plan that, if completed, may have resulted in a permanent loan modification. This suggests that Chase's representations that a modification may be possible were sincere.

There is no doubt that Chase was disorganized in its communications with Plaintiff, that the process of approving or denying Plaintiff's request for a loan modification proceeded at an alarmingly slow rate, that Chase's representatives often failed to

---

[4] The more specific fraud allegations in Plaintiff's FAC alleged fraud in the origination of Plaintiff's loans. FAC ¶¶ 50-52. The Court dismissed all claims of fraud pertaining to loan origination in its March 22, 2010 Order.

10

respond to Plaintiff's inquiries, and that this conduct was deeply upsetting to Plaintiff as he sought to prevent the loss of the home he inherited from his father. However, while Chase's conduct in the handling of Plaintiff's loan was far from exemplary, Plaintiff has failed to show it was fraudulent.

Accordingly, the Court finds that Plaintiff has failed to prove his claim for fraud.

### C. **Violation of the FDCPA**

The FDCPA seeks to eliminate "abusive, deceptive, and unfair debt collection practices" by regulating the type and number of contacts a debt collector can make with a debtor. See 15 U.S.C. § 1692. Plaintiff alleges that CRC violated the FDCPA because (1) it lacked legal authority to collect on the loans; (2) it attempted to collect more than the amount owed; and (3) it failed to properly "validate the debt" as required by the FDCPA. FAC ¶ 60. At trial, Plaintiff's counsel did not indicate what, if any, evidence purportedly supports these allegations, and the Court finds none.

First, Defendants presented the Assignment of Deed of Trust by which MERS assigned all beneficial interest in the First DOT to LaSalle Bank NA, Defs.' Ex. 505, and the Substitution of Trustee through which LaSalle Bank NA then substituted CRC as trustee of the First DOT, Def. Ex. 506. The evidence thus shows that CRC was properly substituted as trustee and therefore possessed legal authority to foreclose on the Property.

Second, no evidence was presented showing that CRC attempted to collect more than the amount owed. The Notice of Trustee's Sale indicated that the amount Plaintiff owed under the First DOT had actually increased from $448,000 to approximately $521,000. Pl.'s

11

Ex. 37.  Plaintiff admitted that he ceased making monthly loan payments in October 2008, and as of January 2009 Plaintiff was in arrears in the amount of $17,608.14.  Defs.' Ex. 507.  Therefore, the evidence does not support Plaintiff's claim that by attempting to foreclose on the Property CRC was attempting to collect more than the amount owed.

Third, Plaintiff presented no evidence that CRC failed to provide a debt validation notice as required by the FDCPA.  The FDCPA provides that, within five days of making initial contact with a debtor "in connection with the collection of any debt," a debt collector must send the debtor a written notice containing the amount of the debt; the name of the creditor; the time period in which the validity of the debt may be challenged; and instructions explaining how the debtor may obtain further evidence of the debt and information about the creditor.  15 U.S.C. § 1692g(a). Plaintiff presented no evidence as to whether CRC provided him with a debt validation notice, and if so, when the notice was provided and whether it conformed to the requirements of section 1692g(a).

Accordingly, the Court finds that Plaintiff has failed to prove his claim for violation of the FDCPA.

///
///
///
///
///
///
///
///

12

## IV. CONCLUSION

For the foregoing reasons, the Court enters judgment in favor of Defendants JP Morgan Chase Bank and California Reconveyance Company on Plaintiff Euel Allen's claims for fraud, violations of the Truth In Lending Act, and violations of the Fair Debt Collection Practices Act.

IT IS SO ORDERED, ADJUDGED, AND DECREED.

Dated: September 2, 2011    

UNITED STATES DISTRICT JUDGE

13